LITCHFIELD TERRACE, LTD., Plaintiff-Appellee, v. THE DEPARTMENT OF PUBLIC HEALTH, Defendant-Appellant.

First District (3rd Division) No. 1—90—3643

Opinion filed September 1, 1993.—Rehearing denied October 8, 1993.

Roland W. Burris, Attorney General, of Springfield (Eve Moran, Assistant Attorney General, of Chicago, of counsel), for appellant.

Gary A. Weintraub, of Chicago, for appellee.

JUSTICE RIZZI delivered the opinion of the court:

Defendant, the Illinois Department of Public Health (Department), charged plaintiff, Litchfield Terrace, Ltd. (Litchfield or the facility), with violating sections 300.3240(a), 300.1210(c)(3) and 300.1210(c)(4) of the Department's "Minimum Standards, Rules and Regulations for Classification and Licensure of Skilled Nursing Facilities and Intermediate Care Facilities" (Minimum Standards), and with committing a "Type A" violation pursuant to section 1—129 of the Nursing Home

Care Act (Act), while caring for a Litchfield resident named James McKay. (77 Ill. Adm. Code §300.3240(a) (1985); 77 Ill. Adm. Code §§300.1210(c)(3), (c)(4) (1988); Ill. Rev. Stat. 1989, ch. 111½, par. 4151—129; 77 Ill. Adm. Code §§300.274(a), (b)(1) (1988).) Defendant found plaintiff guilty of a "Type A" violation and fined plaintiff $5,000 on the basis that it failed to comply with sections 300.3240(a) and 300.1210(c)(3) of the Minimum Standards. (77 Ill. Adm. Code §§300.274(a), (b)(1) (1988); 77 Ill. Adm. Code §300.3240(a) (1985); 77 Ill. Adm. Code §300.1210(c)(3) (1988).) Plaintiff contested the matter in a hearing before defendant. The hearing officer concluded that plaintiff violated two of the Minimum Standards. His report and recommendation were adopted by defendant in a final order dated February 22, 1990. Plaintiff then filed a complaint for administrative review in the circuit court whereupon the trial court reversed defendant's administrative decision on the basis that it was both legally infirm and contrary to the manifest weight of the evidence. Defendant now appeals this order. We reverse.

The issues before this court are (1) whether the trial court erred when it determined that defendant's decision was wrong as a matter of law; and (2) whether the trial court erred when it reversed defendant's final order on the basis that it was contrary to the manifest weight of the evidence.

McKay was a chronic schizophrenic with a history of drug abuse. McKay had been admitted to the Andrew McFarland Mental Health Center (McFarland) on seven different occasions. Records from McFarland dated June 8, 1988, described McKay as having poor judgment and being incapable of making decisions. The records specified that McKay needed supervision as he did not always remember to take his medication and to eat properly. The records also revealed that McKay had to be reminded to maintain appropriate personal hygiene and to dress himself correctly. In addition, the records documented that McKay suffered hallucinations which caused him to become very disoriented, especially when he experienced changes in his daily routine. Although the medication administered to McKay reduced these symptoms, it did not prevent his mental condition from deteriorating under circumstances which would not affect a healthier person in the same manner. While McKay was a patient at McFarland, he absconded from the institution on several occasions from November of 1986, through early June of 1988. McKay and certain staff members at McFarland agreed that his immediate reentry into the community as an independent citizen upon his discharge from the facility would not be in his best interest.

McKay was transferred from McFarland to Litchfield on June 10, 1988. Litchfield, which was located at 1024 East Tyler Street in Litchfield, Illinois, was licensed by the Department as an intermediate care facility. The objective of transferring McKay from McFarland to Litchfield was to facilitate his readjustment to independent living. All of the foregoing matters documented in the McFarland report dated June 8, 1988, were communicated to personnel at Litchfield. McKay's discharge transfer summary from McFarland indicated that his first treatment goals were to reduce agitation and delusional thinking.

During the six-week period that McKay resided at Litchfield, he had a physician's order permitting him to leave the facility for short periods of time. McKay occasionally left the facility to attend the Montgomery Day Treatment Program (Montgomery Program), a rehabilitation program designed to help its participants improve their independent living skills. On the days that McKay attended the Montgomery Program, he was away from Litchfield from approximately 9 a.m. to 3 p.m.

Martha Benning, a long-term care coordinator for the Montgomery County Counseling Center, testified that McKay was informed of the "sign-out" procedure, whereby residents who were permitted to leave the facility for short periods of time gave written notice of their absence prior to leaving the facility by signing a "Release Responsibility for Leave of Absence" form (Release Responsibility Form). Benning stated that McKay was instructed to "sign out" whenever he wanted to leave Litchfield and to tell the nurse where he was going. McKay autographed the Release Responsibility Form on each occasion that he signed out to leave the facility. The document contained the following language:

"I, the undersigned, hereby accept complete responsibility for [name of patient] while away from Litchfield Terrace, Ltd. and absolve the management of said facility, its personnel and the attending physician of responsibility for any deterioration in condition, or accident that may happen while the patient is away."

During the three-week period from July 11 through July 31, 1988, McKay signed out of Litchfield on 29 separate occasions. Benning testified that McKay was not given specific time limits for his authorized absences and that Litchfield personnel could only ask him to return to the facility within a reasonable amount of time. Whenever McKay signed out of the facility, he always returned upon his own initiative.

There were, however, several occasions upon which McKay left the facility without signing out. McKay eloped from Litchfield without

signing the Release Responsibility Form on June 27, 1988, July 11, 1988, July 13, 1988 and July 21, 1988. On all but one of these occasions, he was returned to the facility by Litchfield personnel or the police. On June 27, 1988, McKay was discovered missing from Litchfield and was later observed by a Litchfield employee walking on Route 16 near Gillespie, Illinois. The employee escorted him back to the facility. On July 11, 1988, McKay left the facility twice without permission. On the first occasion, he left through the back door and was escorted back inside by a Litchfield employee. On the second occasion, he was found around the block from the facility by a certified nurse's aide from Litchfield who escorted him back to the facility. McKay had escaped from the facility after removing a screen from his window and climbing through the window. Later, on July 13, 1988, McKay was discovered to be missing from the facility. The police were notified but McKay returned to Litchfield by himself. On July 21, 1988, McKay was found in uptown Litchfield, Illinois, and was returned to the facility by its personnel. On July 10, 1988, McKay also made three unsuccessful attempts to leave Litchfield without signing out.

On the morning of July 31, 1988, McKay signed out of Litchfield at 10:30 a.m. to "walk alone." Tamela Lehnen, the nurse on duty at the time McKay signed out on the above date, testified that she warned him about the hot weather and urged him not to go outside, but that McKay chose to leave the facility anyway. Previously on June 21, 1988, Benning conducted two "in-services" at Litchfield, one for staff members and one for residents, during which she discussed the possible ill effects of hot weather upon the health of the Litchfield residents. McKay attended the latter lecture. McKay also attended a similar in-service which Benning conducted for the Montgomery Program later during that same week.

Lehnen recalled that after McKay left the facility on July 31, 1988, she was advised by nurse's aides around noon on that same date that McKay had not returned for his lunch and medication. McKay had been prescribed the drugs Cogentin and Loxitane as part of his medical treatment program prior to and on July 31, 1988. McKay was scheduled to receive one milligram of Cogentin at noon each day. Lehnen testified that by 12:30 p.m., she asked the nurse's aides to look for McKay. Litchfield personnel searched the facility and the surrounding grounds, but the staff members were unable to locate McKay. At approximately 2 p.m., Lehnen advised Carolyn Speed, the director of nursing, and Judith Hickerson, a Litchfield administrator,

that McKay had signed out and failed to return. Lehnen notified the police of McKay's absence at the direction of Hickerson.

When Lehnen was asked why she did not notify anyone of McKay's absence sooner, she testified: "I really wasn't worried about him. *** [A] lot of our residents don't come back right away. We did have residents who would go to Hardees or McDonalds, places like that." Lehnen admitted, however, that had she known the facts concerning McKay's mental condition and personal habits, she probably would have notified a Litchfield administrator as soon as McKay asked to leave the facility. In addition, Speed testified that she did not know whether or not McKay had judgment sufficiently sound to determine when he needed to come out of the sun.

The police located McKay around 2:45 p.m. on July 31, 1988. McKay was found approximately 6½ miles away from the facility. McKay was taken to the emergency room of St. Francis Hospital in Litchfield, Illinois. McKay had a rectal temperature of 110 degrees upon his arrival at the hospital. McKay died approximately one hour later.

Dr. William K. Drake, the coroner's physician for Montgomery County, Illinois, testified that he determined the cause of McKay's death to be heat stroke caused by prolonged exposure to high temperatures and humidity. According to a local newspaper, the temperature in Litchfield, Illinois, on the day that McKay died was 97 degrees Fahrenheit. Dr. Drake noted that McKay was a schizophrenic and was being treated with phenothiazine derivatives which impaired his ability to sweat, making him more susceptible to a heat stroke than the average person.

During August of 1988, Terri Lee Berriman, a registered nurse employed by the Department, investigated the circumstances of McKay's death. Her investigation consisted of an interview with Lehnen, a review of the facility's records pertinent to McKay which included nurses' notes, medical administration records, flow sheets, care plans and other relevant documentation such as the facility's policies and procedures. In particular, Berriman studied a document entitled "Release Responsibility for Leave of Absence," commonly referred to as a sign-out sheet, in order to compute the length of time McKay stayed away from the facility on occasions when he did sign himself out. She found that his longest absence was 90 minutes, but that on the average, McKay was not absent for longer than 60 minutes.

Berriman's findings, report and supporting documentation were reviewed by another nurse employed by the Department named Donna Huchaba. Huchaba recommended that the facility be charged

with a "Type A" violation based upon the criteria found in section 300.274 of the Minimum Standards. (Ill. Rev. Stat. 1989, ch. 111½, par. 4151—129; 77 Ill. Adm. Code §300.274 (1988).) According to Huchaba, the staff at Litchfield failed to make objective observations with respect to McKay's absence on the day that McKay failed to return to the facility within the average amount of time he usually spent on authorized leave. Huchaba also opined that the high temperature and humidity on July 31, 1988, coupled with the medication McKay was taking, created a condition which substantially increased the probability of McKay's harm or death.

Kathleen Baker, a nurse and supervisor in the Department's Division of Long Term Care and Quality Assurance, agreed with Huchaba's and Berriman's evaluations of the conduct of Litchfield personnel with respect to McKay on the date in question. During her testimony, Baker specified that the staff members at Litchfield should have observed that the length of McKay's absence on the date in question deviated from the usual length of his reported absences and his pattern of not missing either lunch at the facility or his noon medication. Baker stressed that it is the responsibility of the facility to keep an account of its residents and when a resident does not return per his regular schedule, intervention is necessary.

On November 28, 1988, the Department issued a notice of violation against Litchfield for its conduct with respect to the events concerning McKay on July 31, 1988. The Department charged the facility with violating three Minimum Standards. The Minimum Standards in question provide as follows:

"Section 300.3240 Abuse and Neglect

(a) An owner, licensee, administrator, employee or agent of a facility shall not abuse or neglect a resident. (A,B,C)" 77 Ill. Adm. Code §300.3240(a) (1985).

"Section 300.1210 General
* * *
(c) General nursing care shall include at a minimum the following:
* * *
(3) Objective observations of changes in a resident's condition, including mental and emotional changes, as a means for analyzing and determining care required and/or the need for further medical evaluation and treatment. (B,C)

(4) Personal care and hygiene such as clean, neat, well-groomed hair; clean, trimmed fingernails and toenails; clean skin

and freedom from offensive odors; clean mouth and teeth; and care of the lips to prevent dryness and cracking. (B,C)" (77 Ill. Adm. Code §§300.1210(c)(3), (c)(4) (1988).)

The letters in parentheses following each section of the Minimum Standards identify the designated level of the violation. 77 Ill. Adm. Code §300.274(c)(1)(A) (1988).

Litchfield was also cited for a "Type A" violation of the Act. A "Type A" violation is defined as "a violation of the Act or [Minimum Standards] which creates a condition or occurrence relating to the operation and maintenance of a facility presenting a substantial probability that death or serious mental or physical harm to a resident will result therefrom." Ill. Rev. Stat. 1989, ch. 111½, par. 4151—129; 77 Ill. Adm. Code §§300.274(a), (b)(1) (1988).

The Department maintained that it charged Litchfield with the above violations for the following reasons:

"Facility staff failed to use objective observations in the daily personal care/attention of a resident as a means for analyzing and determining care required. Facility staff's failure to provide a resident with proper personal attention in a timely manner resulted in the death of the resident."

The Department found Litchfield guilty of a Type A violation and fined it $5,000 on the basis that it failed to comply with sections 300.3240(a) and 300.1210(c)(3) of the Minimum Standards. (77 Ill. Adm. Code §300.3240(a) (1985); 77 Ill. Adm. Code §300.1210(c)(3) (1988).) The Department also issued a notice of conditional license to Litchfield on that same date. The conditional license replaced the facility's unrestricted license to operate from December 5, 1988, through June 4, 1989.

Litchfield contested the Department's decision in an administrative hearing. The hearing commenced on March 8, 1989. On January 29, 1990, the hearing officer issued a report containing his findings, conclusions of law and recommended decisions. The hearing officer found that Litchfield violated sections 300.3240(a) and 300.1210(c)(3) and (c)(4) of the Minimum Standards. (77 Ill. Adm. Code §300.3240(a) (1985); 77 Ill. Adm. Code §§300.1210(c)(3), (c)(4) (1988).) The report detailed the factual findings which supported the hearing officer's conclusion that staff members at Litchfield neglected McKay by allowing him to remain outside in hot humid weather for approximately 3½ hours. The report referred to McKay's mental disorder, impaired judgment, recent psychotic behaviors, history of taking afternoon meals and medication at the facility and his documented need for supervision. On February 22, 1990, the Director of the Department adopted the hearing officer's report.

Litchfield filed a complaint for administrative review against the Department in the circuit court on March 6, 1990. The cause was heard on November 20, 1990. At the close of the evidence, the trial court reversed defendant's decision on the basis that it was legally infirm and contrary to the manifest weight of the evidence. The trial court reasoned that plaintiff's personnel did not ignore or disregard observations of McKay's behavior before he left the facility or after he failed to return shortly thereafter. The trial court also stated that defendant's decision was erroneous because there were no guidelines or standards governing when McKay should have been reported missing to plaintiff's administrators or area police. Defendant now appeals.

First defendant contends that the trial court erred when it determined that its decision was wrong as a matter of law. We agree. We find that the trial court erred in failing to recognize that both the Act and the Minimum Standards imposed a duty of care upon plaintiff for the protection of McKay and that plaintiff breached its duty to McKay.

■ The Act prohibits the neglect of residents in a residential nursing facility. "Neglect" within the meaning of the Act means "a failure in a facility to provide adequate medical or personal care or maintenance, which failure results in physical or mental injury to a resident or in the deterioration of a resident's physical or mental condition." (Ill. Rev. Stat. 1989, ch. 111½, par. 4151—117.) Section 1—120 of the Act further defines "personal care" to include the "general supervision and oversight of the physical and mental well-being of an individual, who is incapable of maintaining a private, independent residence or who is incapable of managing his person whether or not a guardian has been appointed for such individual." Ill. Rev. Stat. 1989, ch. 111½, par. 4151—120.

The Minimum Standards promulgated by defendant reemphasize these directives. Minimum Standard 300.3240(a) prohibits the neglect of a resident, and Minimum Standard 300.1210(c)(3) mandates that general nursing care include objective observations of changes in a resident's condition as a means to determine the care required. (77 Ill. Adm. Code §300.3240(a) (1985); 77 Ill. Adm. Code §300.1210(c)(3) (1988).) The above statutory and regulatory provisions establish that plaintiff owed McKay certain duties on July 31, 1988.

■ Accordingly, the trial court's determination that plaintiff owed no duty to McKay because there was no rule which articulated the specific course of action to be taken under circumstances such as the ones in the present case, undermines the purpose and intent of the Act and the Minimum Standards promulgated pursuant to its authority. Section 3—101(1) of the Act provides that the licensing system developed by

defendant should be geared towards "[p]rotecting the health, welfare, and safety of residents." (Ill. Rev. Stat. 1989, ch. 111½, par. 4153—101(1).) Under this authority, defendant adopted Minimum Standards (regulations) to insure the adequate provision of services to meet the needs of such residents. (See *Grove School v. Department of Public Health* (1987), 160 Ill. App. 3d 937, 941, 513 N.E.2d 973, 977.) To this end, defendant's failure to promulgate specific rules articulating each and every appropriate procedure to be followed with respect to each resident, under every conceivable circumstance, is unduly burdensome and may not be used as a rationale to allow the facility to evade its statutory and regulatory responsibilities to a resident. Plaintiff's lack of policies or rules to specify when a resident's absence becomes a matter of concern does not absolve it of its duties to McKay. Accordingly, we find that the trial court erred in ruling that plaintiff had no duty to protect McKay.

Finally, defendant alleges that the trial court erred in reversing defendant's final order on the basis that it was contrary to the manifest weight of the evidence. We agree.

The findings of an administrative agency on questions of fact must be considered *prima facie* true and correct. (Ill. Rev. Stat. 1989, ch. 110, par. 3—110; *Grove School*, 160 Ill. App. 3d at 939, 513 N.E.2d at 975.) A court of review has no authority to substitute its own judgement for that of the agency unless the administrative order rendered was contrary to the manifest weight of the evidence. *Grove School*, 160 Ill. App. 3d at 939, 513 N.E.2d at 975.

In the present case, the hearing officer's report, issued January 29, 1990, included the finding that plaintiff's employees neglected McKay by failing to provide him with proper personal attention and general nursing care in a timely manner. This finding is well supported by the record. The record shows that McKay was a schizophrenic with a history of drug abuse. McKay had been admitted to McFarland on seven different occasions. There was testimony that McKay absconded from McFarland on four occasions between November of 1986 and June of 1988. Records from McFarland dated June 8, 1988, documented that McKay suffered hallucinations which caused him to become disoriented. The report also specified that McKay needed supervision since he did not always remember to take his medication, eat properly, maintain proper hygiene or to dress himself in an appropriate manner. All of the foregoing matters listed in the June 1988 McFarland report were communicated to personnel at Litchfield.

The record indicates that McKay was transferred from McFarland to Litchfield because McFarland personnel agreed that his immediate re-entry into the community as an independent citizen upon his discharge

from McFarland would not be prudent. The record shows that there were several occasions upon which McKay absconded from Litchfield without signing out and that upon each of those occasions, he was returned to the facility by Litchfield staff members or the police.

Benning testified that on June 21, 1988, staff members at the facility attended an in-service conducted by Benning whereupon she informed Litchfield personnel about the possible effects of the hot weather upon residents of the facility. Documentary evidence proves that the temperature reached 97 degrees Fahrenheit in Litchfield, Illinois, on July 31, 1988. Lehnen testified that she warned McKay that it was too hot for him to go outside.

Lehnen testified that on the date in question, McKay's statement that he was only going out for a walk around the block remained unheeded. Two hours was a sufficient amount of time for him to have completed this activity. Thus, when McKay failed to return to the facility by noon, it was no longer reasonable for plaintiff's personnel to assume that he was still strolling around the block. Berriman, Baker and Huchaba testified that plaintiff's personnel should have noticed that the length of McKay's absence on the date in question varied from the usual length of his reported absences. Dr. Drake, the coroner's physician for Montgomery County, testified that he determined that McKay's death was caused by heat stroke due to prolonged exposure to high temperatures and humidity. Dr. Drake also noted that McKay was being treated with phenothiazine derivatives which impaired his ability to sweat, making him more prone to suffer a heat stroke than the average person.

We conclude that there was sufficient evidence in the record to support defendant's findings. Defendant's conclusion that McKay's mental health as well as the weather conditions on July 31, 1988, in Litchfield, Illinois, warranted closer monitoring of McKay's activities was not against the manifest weight of the evidence. Accordingly, we conclude that the trial court erred when it reweighed the evidence and reversed defendant's final order on the basis that it was contrary to the manifest weight of the evidence.

For the above reasons, we reverse the order of the circuit court.

Reversed.

TULLY, P.J., and CERDA, J., concur.