# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Maplewood Care, Inc. v. Arnold*, 2013 IL App (1st) 120602

---

| | |
|---|---|
| Appellate Court Caption | MAPLEWOOD CARE, INC., an Illinois Corporation, Plaintiff-Appellant, v. DAMON T. ARNOLD, M.D., M.P.H., Director of the Department of Public Health; THE DEPARTMENT OF PUBLIC HEALTH, and TERESA GARATE, Assistant Director, the Department of Public Health, Defendants-Appellees. |
| District & No. | First District, Fourth Division<br>Docket No. 1-12-0602 |
| Rule 23 Order filed<br>Rule 23 Order<br>withdrawn<br>Opinion filed | February 28, 2013<br><br>May 6, 2013<br>May 9, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The findings of an administrative law judge for the Department of Public Health that plaintiff nursing home violated the Skilled Nursing and Intermediate Care Facilities Code was not clearly erroneous, since the evidence showed the home admitted and kept a resident identified as a criminal offender without properly obtaining a criminal background check, failed to provide the necessary care and service to the offender and the resident raped by the offender, and neglected both of those residents by failing to provide proper supervision. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CH-54816; the Hon. Mary L Mikva, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on<br>Appeal | John T. Schriver, of Duane Morris LLP, of Chicago, and Sarah Barrish, of Lincolnwood, for appellant. |
| --- | --- |
| | Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Paul Racette, Assistant Attorney General, of counsel), for appellees. |
| Panel | JUSTICE PUCINSKI delivered the judgment of the court, with opinion. |
| | Justices Fitzgerald Smith and Epstein concurred in the judgment and opinion. |

## OPINION

¶ 1                                                BACKGROUND

¶ 2        The present case arises from a finding by the Illinois Department of Public Health (Department) that Maplewood Care, Inc. (Maplewood), a nursing facility in Elgin, Illinois, had failed to properly conduct a background check and supervise a 21-year-old resident with a criminal record (R3), which resulted in the rape of a 69-year-old resident (R2). Maplewood had submitted an incorrect birth date for R3 and thus did not obtain R3's criminal history. Under the Nursing Home Care Act (Act) (210 ILCS 45/1-101 *et seq.* (West 2008)) and the Skilled Nursing and Intermediate Care Facilities Code (77 Ill. Adm. Code 300), nursing homes are required to perform a criminal background check on all its residents. If the background check reveals that the resident is a registered sex offender or on parole or probation for a felony offense, the facility is required to notify the Department. The Department then issues a "Criminal History Analysis report" (CHAR) containing its risk analysis regarding the resident. The facility is then required to fashion an appropriate care plan for the resident in compliance with the Act and the regulations under the Skilled Nursing and Intermediate Care Facilities Code. Here, because Maplewood supplied an incorrect birth date for R3, it did not receive R3's criminal history, and thus never notified the Department so that the Department could issue a CHAR for use in Maplewood's care plan for R3. Subsequently, R3 raped R2.

¶ 3        On April 15, 2009, the Department issued a notice to Maplewood that it had committed "Type A" violations and "Type B" violations of the Act and the Department's regulations. The Department's notice of violation stated that Maplewood committed violations of the following provisions of the Skilled Nursing and Intermediate Care Facilities Code (77 Ill. Adm. Code 300): (1) a Type B violation of section 300.620(d)(3) (77 Ill. Adm. Code 300.620(d)(3) (2007) (prohibiting a facility from admitting or keeping a resident who is an identified offender without properly requesting a criminal background check)); (2) a Type A violation of section 300.1210(a) (77 Ill. Adm. Code 300.1210(a), amended at 23 Ill. Reg.

8106 (eff. July 15, 1999) (requiring a facility to provide necessary care and service to its residents)); and (3) a Type A violation of section 300.3240(a) (77 Ill. Adm. Code 300.3240(a) (1991) (prohibiting neglect of residents)). The Department had also included in its notice of violation a Type B violation of section 300.615(g) (77 Ill. Adm. Code 300.615(g), amended at 30 Ill. Reg. 5213 (eff. Mar. 2, 2006) (setting forth the procedural requirements for conducting background checks on all new admissions and reporting to the Department)). However, the Department later withdrew this violation of section 300.615(g). The Department issued a conditional six-month license, fined Maplewood $20,000, and placed Maplewood on a quarterly list of violators of the Act. Maplewood requested an evidentiary hearing to contest the notice of violations.

¶ 4    In support of its notice of violations, the Department called two witnesses at the hearing, Vicki Hill, a Maplewood psychiatric rehabilitation specialists coordinator, who was R3's caseworker, and Jamie Lloyd, Maplewood's administrator. Maplewood called one witness, Mark Thompson, its former social service director and assistant administrator. The following facts were adduced at the administrative hearing:

¶ 5    R3 was first admitted to Maplewood in April 2008 because he was diagnosed with bipolar disorder with aggression and a history of polysubstance abuse and needed structure and supervision. R3 reported to the staff that he had attempted suicide 10 or more times and had been hospitalized 18 or 19 times. Maplewood requested a criminal background check on R3 from the Illinois State Police. The background check revealed convictions for aggravated battery with a weapon, aggravated battery, domestic battery, driving without a license, and false report of an offense. R3 had been sentenced to two years in prison for the aggravated-battery-with-a-weapon conviction and to lesser punishments for the other convictions. After serving his sentence, R3 was placed on probation. R3 also had a physical altercation with another resident at his first nursing home placement. As required, Maplewood submitted the background check results to the Department for the Department to make a risk assessment of R3. The Department is then supposed to issue a CHAR back to the facility.

¶ 6    While the CHAR from the Department was pending, based on the results of the background check, Maplewood also classified R3's risk for its own internal purposes. R3 was assigned Vicki Hill as his caseworker, with whom he met weekly. Hill, along with a team of clinical professionals at Maplewood, developed a care plan for R3 which included R3's criminal history and history of aggression, with interventions that would be followed in the event R3 exhibited aggressive or violent behavior at Maplewood.

¶ 7    Thompson testified that he was aware of R3's criminal background and classified R3 as "medium" risk. Thompson testified that of the 12 times he had submitted criminal histories to the Department, he had never seen the Department classify any resident as "high" risk. Thompson reviewed and agreed with Maplewood's care plan for R3.

¶ 8    Almost immediately after his admission to Maplewood in April 2008, R3 exhibited behavioral and criminal problems. On May 1, 2008, R3 smoked marijuana with other residents. On May 7, R3 borrowed another resident's vehicle and left the facility. An officer attempted to pull over R3 for a traffic violation but R3 fled and returned to Maplewood. The

police followed R3 to Maplewood and took him into custody for violating his probation. Maplewood discharged R3 that same day. At the time, Maplewood had not yet received the CHAR from the Department regarding R3. Thereafter, no Department CHAR was received due to R3's discharge.

¶ 9 In summer 2008, R3 was admitted to a different facility, All Faith Nursing Home, which also requested a background check on R3. This background check included all the previous convictions as well as the recent charges for fleeing the police and speeding.

¶ 10 In November 2008, R3 was readmitted to Maplewood because he needed structure and supervision. Maplewood again requested a background check on R3, but provided the Illinois State Police with an incorrect birth date for R3. Because of that error, the background check indicated that R3 had no criminal record, Maplewood did not notify the Department that R3 was an identified offender, and the Department did not draft and issue a CHAR.

¶ 11 However, Hill was again assigned as R3's caseworker. Hill was aware of R3's previous psychological and criminal history. A November 2008 document titled "Minimum Data Set" prepared by Hill reflected that R3 had a history of violence, including violence to others within the last year. Another document drafted by Hill indicated that R3 had been involved in a physical altercation with another resident at his first nursing facility placement prior to his first admission to Maplewood. Another document drafted by Hill stated that R3 had impaired decision-making at times, tended not to follow policies at times, and frequently tended to be the focus of negative attention. While interviewing him in November 2008, Hill found R3 to be evasive in discussing his issues. From November 2008 through January 2009, Hill found R3 to be noncompliant with his treatment plan for substance abuse, including alcohol and drug use and not attending meetings. R3 had been a cocaine user but denied that he had a substance-abuse problem. Hill further testified that upon R3's readmission in November 2008, R3's diagnoses and history were the same, and that the Minimum Data Set report for his second admission indicated R3 has had addictive behaviors, harms himself, and exhibits violent behaviors. R3 had a history of aggression and was involved in a physical altercation with another resident at his first nursing home placement. Hill testified that R3's care plan regarding ways to deal with R3's aggression required staff intervention. R3 was to be redirected by staff when agitated.

¶ 12 Nurses' notes during R3's second admission to Maplewood reflected the following. On November 13, 2008, R3 was awake all night playing video games in the dining room. On November 15, 2008, upon returning to Maplewood after being out of the facility on a pass, R3 was suspected of having used alcohol. On December 7, 2008, again upon returning to Maplewood after having been out on a pass, R3 was suspected of being under the influence of substances but would not disclose what he had taken. A test revealed R3 had a blood alcohol level of 0.08. On December 21, 2008, R3 was observed walking unsteadily in the hallway, unable to talk freely and confused. An alcohol test came back negative, but drug use was suspected.

¶ 13 On December 5, 2008, R3 had informed Maplewood staff that he was sexually frustrated and had increased sexual urges and thoughts due to separation from his fiancée. R3 was advised by the staff to masturbate. There was no additional monitoring of R3 after December

5, 2008. R3 is 6 feet tall and weighed 217 pounds.

¶ 14    On January 17, 2009, at around 1 a.m. R2 left his room on the first floor and went to R2's room, which was on the second floor in the opposite wing. The Department's Exhibit 20 was an overview map of Maplewood, depicting that the building was in the shape of an "X," with a nurse's station in the middle of the intersection of wings on each floor. No one monitored R3 and stopped his movement. R3 entered R2's room and raped her vaginally and anally. At the time, R2 was 69 years old.

¶ 15    R3 called the police himself to report his assault. A nurse doing rounds entered R2's room and observed R2 was naked and looked terrified. R2 reported the incident and told her someone was in the bathroom. The nurse found R3 in R2's bathroom. Police officers arrived on the scene. The police ran a warrant check on R3 and discovered he had an outstanding warrant for battery and was taken into custody. While in custody, R3 admitted that he sexually assaulted R2. R3 pleaded guilty to aggravated criminal sexual assault of R2 and was sentenced to 12 years in prison.

¶ 16    R2 was hospitalized with vaginal and rectal tears and was emotionally distraught and looked "terrified." R2 did not have any previous interactions with R3 and denied consenting to have sex with him. However, Maplewood's internal investigation concluded that the sex had been "consensual." Maplewood submitted a final report to the Department concluding that the sexual intercourse was consensual. The report further stated that R2 had not alleged that R3 had sexually assaulted her and did not appear to be in distress, and that R3 had "no history of any inappropriate behaviors" and "is known to be cooperative and respectful." Further, the report submitted by Maplewood stated that R3's "criminal background check shows no record."

¶ 17    Jamie Lloyd, the licensed administrator of Maplewood, testified that during the time of R3's first admission to Maplewood in April of 2008 Maplewood did not receive a CHAR for R3 because he was discharged prior to the receipt of the CHAR. Lloyd was unaware if anyone on Maplewood's staff requested a CHAR in November 2008 when R3 was readmitted and did not inquire as to why there was no CHAR after receiving the notice of violations. Lloyd acknowledged that Maplewood submitted an incorrect background check for R3 because it contained the wrong birth date for R3.

¶ 18    Lloyd testified that when he arrived at Maplewood at 12:45 a.m. on January 17, 2008 after being notified of the incident he spoke with the charge nurse "Cindy" Maria Lao Mangahas and a police officer. Lloyd reviewed Mangahas's statement, which indicated that she entered R2's room during rounds and found R2 naked and moaning with a terrified look on her face, and that R2 told her a man "made love to her in the front and back and it hurts" and told Mangahas someone was in the bathroom. Mangahas found R3 in the bathroom. Lloyd reviewed Maplewood's final report and the conclusion that the sexual intercourse was consensual and stated he was unable to draw a conclusion "one-way or the other, as I was not able to interview either people involved, or had access to any of the hospital information or police information." Lloyd testified that two consultants from SIR Management assisted in his investigation and signed off on the final report submitted to the Department. Lloyd testified he expressed his concerns with the conclusion in the report with the two consultants

but not to the Department. Lloyd stated he did not report the inaccurate statement in the report that R2 "did not sound in distress" to the Department because the Department surveyor arrived.

¶ 19    The administrative law judge took judicial notice of R3's prior convictions of domestic battery, aggravated battery with a weapon, and complaint for battery and warrant for failure to appear, as well as the conviction for aggravated criminal sexual assault against R2. The administrative law judge also took notice that in January 2009 (at the time of his rape of R2) R3's diagnoses included schizophrenia, and bipolar disorder with aggression. The administrative law judge also noted Maplewood's progress note dated December 5, 2008, which stated that R3 stated he had increased sexual urges and that Maplewood admitted there was no additional monitoring of R3. The administrative law judge also noted Maplewood "failed to do an accurate background check on R3."

¶ 20    On November 19, 2010, the administrative law judge issued her report and recommendation and made the following findings: (1) The Department proved Maplewood violated section 300.620(d)(3), based on the admission of R3 as an identified offender without properly requesting a criminal background check, reporting the results of the check to the Department if certain convictions are revealed, and incorporating the Department's risk analysis into the resident's care plan. (2) Maplewood violated section 300.1210(a) when it failed to provide general supervision and oversight for R2 and R3. (3) Maplewood violated section 300.3240(a) based on Maplewood's failure to submit R3's correct birthdate to the State Police for the background check and failed to obtain an updated criminal history and a risk analysis from the Department for R3's care plan, which resulted in the neglect of both R2 and R3 by permitting R3 to leave his room and enter R2's room in the middle of the night and sexually assault her. (4) Maplewood did not take corrective action following the rape and instead submitted a report to the Department that stated the incident was consensual when this statement was belied by Maplewood's own staff who discovered R3 in R2's room right after the assault.[1]

¶ 21    The Department's final order adopted the administrative law judge's report and recommendation. Maplewood filed the instant action in circuit court against the Department, its Director, and the Assistant Director, appealing the Department's administrative determination, but the circuit court affirmed. Maplewood appealed.

¶ 22                              ANALYSIS

¶ 23    At the administrative hearing, the Department was required to establish the violations by a preponderance of the evidence. See 210 ILCS 45/3-320 (West 2008) ("All final administrative decisions of the Department under this Act are subject to judicial review under the Administrative Review Law [(735 ILCS 5/3-101 *et seq.*)], as now or hereafter amended, and the rules adopted pursuant thereto."); 5 ILCS 100/10-15 (West 2008) ("Unless otherwise provided by law or stated in the agency's rules, the standard of proof in any contested case hearing conducted under this Act by an agency shall be the preponderance of

---

[1]This finding is not at issue in this appeal.

the evidence.”).

¶ 24    The scope of our review is governed by the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2008)):

> “§ 3-110. Scope of review. Every action to review any final administrative decision shall be heard and determined by the court with all convenient speed. The hearing and determination shall extend to all questions of law and fact presented by the entire record before the court. No new or additional evidence in support of or in opposition to any finding, order, determination or decision of the administrative agency shall be heard by the court. The findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct.” 735 ILCS 5/3-110 (West 2008).

¶ 25    We review the decision of the Department and not the trial court’s determination. *Aurora Manor, Inc. v. Department of Public Health*, 2012 IL App (1st) 112775, ¶ 8 (citing *Exelon Corp. v. Department of Revenue*, 234 Ill. 2d 266, 272 (2009)). We recently reiterated our standard of review in *Aurora Manor, Inc.*:

> “The appropriate standard of review is determined by whether the question is one of fact, one of law, or a mixed question of fact and law. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008). The findings and conclusions on questions of fact made by the administrative agency are held to be *prima facie* true and correct. 735 ILCS 5/3-110 (West 2010). Therefore, the court will not reweigh the evidence or substitute its judgment for that of the agency, but will only ascertain if the findings of fact are against the manifest weight of the evidence. *Cinkus*, 228 Ill. 2d at 210. In contrast, an agency’s determinations on questions of law are not binding on a reviewing court and are reviewed *de novo*. *Cinkus*, 228 Ill. 2d at 210-11. However, courts give substantial weight and deference to an agency’s interpretation of an ambiguous statute. *Illinois Consolidated Telephone Co. v. Illinois Commerce Comm’n*, 95 Ill. 2d 142, 152 (1983). ***
>
> Mixed questions of law and fact are ‘ “questions in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated.” ’ (Internal quotation marks omitted.) *Cinkus*, 228 Ill. 2d at 211 (quoting *American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board, State Panel*, 216 Ill. 2d 569, 577 (2005)). An agency’s findings on mixed questions of law and fact are reviewed under a clearly erroneous standard of review and, consequently, will not be reversed unless the reviewing court has a definite and firm conviction that a mistake has been made. *Cook County Republican Party v. Illinois State Board of Elections*, 232 Ill. 2d 231, 245 (2009). This standard affords more deference to the agency on the basis of its experience and expertise than the *de novo* standard, but less deference than the manifest weight of the evidence standard applied to an agency’s findings of fact. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 392, 395 (2001).” *Aurora Manor, Inc.*, 2012 IL App (1st) 112775, ¶¶ 9-10.

¶ 26    Maplewood argues we should apply the *de novo* standard of review because a question

of law based on the interpretation of the statute is presented, namely, "Is there a strict liability standard to which nursing facilities are to be held?" However, the relevant provisions of the regulations in the Skilled Nursing and Intermediate Care Facilities Code (77 Ill. Adm. Code 300) are clear and unambiguous. Thus, *de novo* review is inappropriate.

¶ 27 Maplewood also argues that there are questions of fact which must be reviewed under the manifest weight of the evidence standard, as well as mixed questions of law and fact which are reviewed under the clearly erroneous standard. However, the following facts were undisputed at the hearing and remain undisputed on appeal: a background check and criminal history of R3 were not obtained upon R3's second admission; as a result, Maplewood did not obtain a CHAR from the Department based on R3's criminal history; no risk analysis (CHAR) from the Department was incorporated into R3's care plan; Maplewood was aware of R3's history of alcohol and drug abuse and his mental health problems, which included a diagnosis of bipolar disorder with aggression; R3 was previously discharged due to an incident where he fled from police; R3 told Maplewood staff about increased sexual urges; there was no increased supervision of R3 following his statements regarding his sexual urges; R3 managed to leave his room in the middle of the night and go to R2's room either undetected or unstopped; and R3 raped R2. Thus, contrary to Maplewood's argument, the factual findings themselves are not at issue. Review under the manifest weight of the evidence standard is therefore also inappropriate.

¶ 28 Part of the confusion regarding the standard of review may stem from the fact that the administrative law judge placed some of his determinations of the application of the law to the facts in the "factual findings" section of his decision. However, such conclusions are mixed questions of law and fact. "Mixed questions of fact and law 'are "questions in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." ' " *Cinkus*, 228 Ill. 2d at 211 (quoting *American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board, State Panel*, 216 Ill. 2d 569, 577 (2005), quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19 (1982)). We review the determinations by the administrative law judge that Maplewood committed the three violations by applying the standards to the undisputed facts of this case under the appropriate clearly erroneous standard.

¶ 29 The required showing to establish each type of violation is set forth in the Code. A notice of violation against a facility based on a Type A violation must set forth that a violation of the Skilled Nursing and Intermediate Care Facilities Code "creates a condition or occurrence relating to the operation and maintenance of a facility presenting a substantial probability that death or serious mental or physical harm will result therefrom." 77 Ill. Adm. Code 300.274(b)(1), amended at 13 Ill. Reg. 4684, 4687 (eff. Mar. 24, 1989). A notice of violation against a facility based on a Type B violation must set forth that a violation "create[d] a condition or occurrence relating to the operation and maintenance of a facility directly threatening to the health, safety or welfare of a resident." 77 Ill. Adm. Code 300.274(b)(2), amended at 13 Ill. Reg. 4684, 4687 (eff. Mar. 24, 1989).

¶ 30 The administrative law judge found that Maplewood committed violations of the

following provisions of the Skilled Nursing and Intermediate Care Facilities Code (77 Ill. Adm. Code 300): (1) a Type B violation of section 300.620(d)(3) (77 Ill. Adm. Code 300.620(d)(3), (2007) (prohibiting a facility from admitting or keeping a resident who is an identified offender without properly requesting a criminal background check)); (2) a Type A violation of section 300.1210(a) (77 Ill. Adm. Code 300.1210(a), amended at 23 Ill. Reg. 8106 (eff. July 15, 1999) (requiring a facility to provide necessary care and service to its residents)); and (3) a Type A violation of section 300.3240(a) (77 Ill. Adm. Code 300.3240(a) (1991) (prohibiting abuse and neglect of residents)). We review the determination of each violation in turn.

¶ 31                             I. Violation of Section 300.620(d)(3)

¶ 32        Section 300.620(d)(3) provides as follows:

"d) No person shall be admitted to or kept in the facility:

* * *

3) Who is an identified offender, unless the requirements of Section 300.615 for new admissions and the requirements of Section 300.625 are met." 77 Ill. Adm. Code 300.620(d)(3) (2007).

¶ 33        Section 300.615 sets forth various specific requirements regarding background checks on each newly admitted resident. Section 300.615(e) of title 77 of the Code requires that nursing home facilities obtain a criminal background check for each new resident within 24 hours of admission to confirm whether the resident has a criminal history. 77 Ill. Adm. Code 300.615(e), amended at 31 Ill. Reg. 6044, 6057-58 (eff. Apr. 3, 2007). The facility is also required to "check for the individual's name on the Illinois Sex Offender Registration website at www.isp.state.il.us and the Illinois Department of Corrections sex registrant search page at www.idoc.state.il.us to determine if the individual is listed as a registered sex offender." 77 Ill. Adm. Code 300.615(f), amended at 31 Ill. Reg. 6044, 6058 (eff. Apr. 3, 2007). In the event a resident is found to be an "identified offender," the resident must be reported by the facility to the Department. 77 Ill. Adm. Code 300.615(j), amended at 31 Ill. Reg. 6044, 6059 (eff. Apr. 3, 2007). The Department then issues a CHAR, which classifies the offender as "low," "moderate" or "high" risk, and sends the CHAR back to the facility with its risk-level analysis of the identified offender resident. Then, "[t]he facility is responsible for the development of a plan of care appropriate to the needs of the identified offender, in accordance with Section 300.625." 77 Ill. Adm. Code 300.615(g), amended at 30 Ill. Reg. 5213, 5250 (eff. Mar. 2, 2006).

¶ 34        Maplewood's violation of section 300.620(d)(3) was set forth as a Type B violation. Thus, the question is whether the violation of section 300.620(d)(3) "create[d] a condition or occurrence relating to the operation and maintenance of a facility directly threatening to the health, safety or welfare of a resident." 77 Ill. Adm. Code 300.274(b)(2), amended at 13 Ill. Reg. 4684 (eff. Mar. 24, 1989).

¶ 35        The administrative law judge found that Maplewood violated section 300.620(d)(3) "by admitting and keeping R3[,] an identified offender, in the facility without complying with Section 300.625, 300.615(e), (j), and (l)." The administrative law judge reasoned as follows:

"It is incontrovertible that the failure of the facility to properly submit R3's information to the State Police in November, 2008 was unintentional. But this failure resulted in the CHAR not being done and thus not properly incorporated into R3's care plan. R3 was an identified offender under the Code. This violation of Section 300.620(d)(3) created an occurrence relating to the operation of the facility which directly threatened the health, safety and welfare of R2, R3 and all the residents of the facility."

¶ 36    Maplewood argues that in order to sustain a finding of this violation, the Department had to prove that its risk analysis for R3 would have determined he was high risk and that the inclusion of this risk level in his CHAR would have prevented the rape of R2. However, this reasoning is not how the regulations operate, nor is it the burden of proof at the administrative hearing.

¶ 37    Section 300.620(d)(3) specifically prohibits admitting a person who is an identified offender if the requirements of section 300.615 for new admissions are not met. 77 Ill. Adm. Code 300.620(d)(3) (2007). Section 300.615 requires, without exception, that nursing home facilities obtain a criminal background check for each new resident. 77 Ill. Adm. Code 300.615(e), amended at 31 Ill. Reg. 6044, 6057-58 (eff. Apr. 3, 2007). It is undisputed that Maplewood did not obtain R3's criminal background upon his second admission. As the Department argues in its brief on appeal, "[b]y not obtaining correct background check results for R3, submitting that information to the Department, and incorporating the Department's risk analysis into his care plan, Maplewood put all of its residents at risk."

¶ 38    The Department was not required to prove that R2's rape would have been prevented if Maplewood had obtained R3's criminal history. The Act provides that "[a]ll final administrative decisions of the Department under this Act are subject to judicial review under the Administrative Review Law." 210 ILCS 45/3-320 (West 2008). In an administrative hearing under the Administrative Review Law, the burden of proof is the lesser civil burden of a preponderance of the evidence. *Grames v. Illinois State Police*, 254 Ill. App. 3d 191, 204 (1993). "A proposition is proved by a preponderance of the evidence when the proposition is more probably true than not true." *In re Terry H.*, 2011 IL App (2d) 090909, ¶ 14. The violation of section 300.620(d)(3) was a Type B violation. Thus, the Department only had to prove that it was more probably true than not that Maplewood's failure to comply with section 300.620(d)(3) was an occurrence "relating to the operation and maintenance of a facility directly threatening to the health, safety or welfare of a resident." 77 Ill. Adm. Code 300.274(b)(2), amended at 13 Ill. Reg. 4684, 4687 (eff. Mar. 24, 1989). The administrative law judge's conclusions of law all stated specifically that the Department sustained its proof by a preponderance of the evidence, including the violation of section 300.620(d)(3). Moreover, Maplewood's argument questioning the causal relationship between the lack of a CHAR and R2's rape ignores the fact that the failure to get a CHAR for R3 threatened the health, safety and welfare of all the residents at Maplewood.

¶ 39    Maplewood argues the error in submitting the wrong birth date for R3 in requesting a background check was an unintentional typographical error and that leveling penalties against it based on this mistake alone essentially amounts to strict liability. However, the administrative law judge acknowledged that the error was unintentional. The fact is that

Maplewood failed to obtain R3's criminal background and violated section 300.620(d)(3). There is no defense for not properly obtaining a criminal background check in either the Act or in the regulations in the Skilled Nursing and Intermediate Care Facilities Code. Maplewood cites to no authority holding that a mistake or typographical error can excuse this violation.

¶ 40    Maplewood argues that "[e]ven if the Department had proven a *per se* violation of any of the three Code Sections cited, the Department did not and could not prove that such violation created a substantial probability of harm or a direct threat to the safety of the residents." However, the very fact that background checks are required and that facilities are prohibited from admitting or housing identified offenders otherwise indicates such offenders present a "substantial probability of harm or a direct threat to the safety of the residents." Background checks are required to determine which newly admitted residents are "identified offenders" under section 1-114.01 of the Act. See 210 ILCS 45/1-114.01 (West 2008). Section 1-114.01 defines "identified offender" as "a person who has been convicted of any felony offense listed in Section 25 of the Health Care Worker Background Check Act, is a registered sex offender, or is serving a term of parole, mandatory supervised release, or probation for a felony offense." 210 ILCS 45/1-114.01 (West 2008). R3 was an identified offender. Section 300.620(d)(3) prohibits admission of new residents who are identified offenders unless sections 300.615 and 300.625 are met. 77 Ill. Adm. Code 300.620(d)(3) (2007). Section 1-114.01 was enacted in 2005 and at the time of the incident in this case provided as follows:

> "§ 1-114.01. Identified offender. 'Identified offender' means a person who has been convicted of any felony offense listed in Section 25 of the Health Care Worker Background Check Act, is a registered sex offender, or is serving a term of parole, mandatory supervised release, or probation for a felony offense." 210 ILCS 45/1-114.01 (West 2008) (added by Pub. Act 94-163, § 5 (eff. July 11, 2005)).

¶ 41    Although the provisions of the Act and the Skilled Nursing and Intermediate Care Facilities Code are clear and unambiguous on this issue and there is no issue of statutory interpretation for *de novo* review, we point out that the legislative intent in prohibiting the admission or housing of identified offenders without background checks was specifically to protect the safety of the residents of nursing homes. In the debate concerning the bill prior to the enactment of Public Act 94-163 adding section 1-114.01 to the Act, the following comments were made by Representative Jim Brosnahan explaining the nature and necessity of the legislation:

> "The first part of the Bill amends the Nursing Home Care Act and then there's another provision of the Bill that amends the Code of Corrections. This legislation is trying to deal with the problem that the State of Illinois has had over the years dealing with felons and including, but not limited to, registered sex offenders in nursing homes. What this Bill would do, it would require the Illinois Department of Public Heath to promulgate rules within 30 days of the pass [*sic*] of this legislation to ensure that nursing home facilities make sure that they provide for adequate assessment identification in care of these felons and sex offenders. It also... [*sic*] would prohibit any nursing home facility from taking a felon or registered sex offender if they don't comply with the rules." 94th

Ill. Gen. Assem., House Proceedings, May 23, 2005, at 16 (statements of Representative Brosnahan).

¶ 42 Maplewood cannot dispute the fact that a violation of section 300.615(d)(3) occurred due to the failure to obtain R3's criminal background. The administrative determination that Maplewood violated section 300.615(d)(3) was not clearly erroneous. We affirm the finding on this violation.

¶ 43                                    II. Violation of Section 300.1210(a)

¶ 44 Section 300.1210(a) requires that a facility provide the necessary care and services to maintain the highest "practicable" physical, mental and psychological well being of its residents, in accordance with each resident's comprehensive assessment and care plan. 77 Ill. Adm. Code 300.1210(a), amended at 23 Ill. Reg. 8106 (eff. July 15, 1999). The Department alleged that Maplewood's violation of section 300.1210(a) was a Type A violation. Thus, the question is whether Maplewood's violation of this regulation "create[d] a condition or occurrence relating to the operation and maintenance of a facility presenting a substantial probability that death or serious mental or physical harm will result therefrom." 77 Ill. Adm. Code 300.274(b)(1), amended at 13 Ill. Reg. 4684 (eff. Mar. 24, 1989). The administrative law judge's determination that this violation occurred is reviewed under the clearly erroneous standard.

¶ 45 The administrative law judge determined the following:

"The facility committed a Type A violation by failing to provide the highest necessary care and services to attain or maintain the highest practicable physical, mental and psycho-social well-being of R2 and R3 in accordance with their comprehensive assessment and plans of care. The facility failed to provide adequate and properly supervised nursing care and personal care to meet the total nursing and personal care needs of R2 and R3."

¶ 46 The administrative law judge further determined:

"Because of the facility's violation of Section 300.620(d)(3), the facility was unable to provide the necessary care and services to attain or maintain the highest practicable physical, mental and psychological well-being of R3, in accordance with his care plan, because his care plan lacked the CHAR. Qualified facility staff testified that the case plan prepared for R3 in November, 2008 included his known criminal history and an internal risk assessment, which assessed R3 as a 'moderate' risk. Ms. Hill, educated in family services with six years experience as a PRSC at the facility, also testified that she met with R3 often, and alone, and never feared for her physical safety or the safety of others in the facility.

However, R3 and R2 were incapable of maintaining a private, independent residence and were incapable of managing their persons. Both were admitted to the facility as needing 'structure and supervision'. [*sic*] R3's diagnoses includes [*sic*] bipolar disorder with aggression. He had a 2008 conviction of domestic battery, a Lake County conviction of aggravated battery with a weapon, and an outstanding warrant for failure to appear. ***

-12-

R3 was an identified offender under the Code and his care plan did not include this designation."

¶ 47    The parties dispute whether Maplewood's own care plan was properly before the administrative law judge and whether it can be relied upon by Maplewood on appeal. However, the administrative law judge clearly referenced Maplewood's care plan and, to that extent, we consider it.

¶ 48    Maplewood argues: "It was the Department's burden to prove what would have been contained in the CHAR would have made a substantive difference in the care plan of R3 and how the lack thereof created a direct threat." The Department was required to prove each violation only by a preponderance of the evidence–that it was more probably true than not that a violation of section 300.1210(a) "create[d] a condition or occurrence relating to the operation and maintenance of a facility presenting a substantial probability that death or serious mental or physical harm will result therefrom" to prove this Type A violation. 77 Ill. Adm. Code 300.274(b)(1), amended at 13 Ill. Reg. 4684 (eff. Mar. 24, 1989). Maplewood maintains that "the Department failed to set forth any evidence that the facility's receipt of the Department's CHAR more likely than not would have substantively changed R3's care plan or altered R3's risk assessment."

¶ 49    The fact that Maplewood contends that "the evidence presented establishe[d] that regardless of the risk level contained in the CHAR, the care plan would have remained the same" is disturbing given R3's convictions for domestic battery and aggravated battery with a weapon. R3's caseworker at Maplewood also knew of R3's physical altercation with another resident at his first nursing home placement. Thus, Maplewood was aware that R3 had a history of physical violence not only generally but also within the context of a nursing home. Maplewood also knew that R3 had voiced strong sexual urges. To contend that a 21-year-old, 6-foot, 217-pound male with a history of physical violence, substance abuse problems, mental health issues and aggression, who vocalized strong sexual urges in a nursing home with helpless older residents, would have been treated the same as a resident with no such problems or criminal history is an unsupportable argument.

¶ 50    Maplewood cites to no authority for its proposition that missing a required background check and failure to incorporate the required CHAR into an identified offender's care plan is excusable. We have no difficulty in concluding that the administrative law judge was correct in determining that such a failure violates the requirement under section 300.1210(a) to provide the necessary care and services to attain or maintain the "highest practicable" physical, mental, and psychological well-being of the residents.

¶ 51    Maplewood argues that "[t]he occurrence of an incident does not inherently establish that a facility was in violation of the Code, let alone that such an incident was caused by an act or omission of the facility." However, the occurrence of the incident, by itself, is not what established the violations; rather, the occurrence is what prompted the investigation by the Department into Maplewood's omissions and failure in its care and supervision of R3 and R2.

¶ 52    Maplewood also contends that the administrative law judge applied the wrong standard in stating that Maplewood failed to provide "adequately and properly supervised personal

-13-

care *** in that it failed to provide general supervision and oversight." However, the administrative law judge's finding as set forth above was that Maplewood "committed a Type A violation by failing to provide the highest necessary care and services to attain or maintain the highest practicable physical, mental and psycho-social well-being of R2 and R3 in accordance with their comprehensive assessment and plans of care," which mirrors the language of section 300.1210(a). See 77 Ill. Adm. Code 300.1210(a), amended at 23 Ill. Reg. 8106 (eff. July 15, 1999). There was no error in the application of the law.

¶ 53    Maplewood's failure to properly provide the necessary care and services in fashioning an appropriate care plan for R3 due to its failure to obtain the required criminal background and CHAR constituted a violation of section 300.1210(a) that created a condition that presented a substantial probability that serious mental or physical harm will result therefrom. The administrative law judge's determination that Maplewood violated section 300.1210(a) was not clearly erroneous. We affirm.

¶ 54                    III. Violation of Section 300.3240

¶ 55    Section 300.3240(a) of title 77 of the Code provides that "[a]n owner, licensee, administrator, employee or agent of a facility shall not abuse or neglect a resident. (A, B) (Section 2-107 of the [Nursing Home Care]Act)." 77 Ill. Adm. Code 300.3240(a), amended at 15 Ill. Reg. 554 (eff. Jan. 1, 1991). Section 1-103 of the Nursing Home Care Act defines "abuse" as "any physical or mental injury or sexual assault inflicted on a resident other than by accidental means in a facility." 210 ILCS 45/1-103 (West 2008). Section 1-117 of the Act defines "neglect" as "a failure in a facility to provide adequate medical or personal care or maintenance, which failure results in physical or mental injury to a resident or in the deterioration of a resident's physical or mental condition." 210 ILCS 45/1-117 (West 2008). As the administrative law judge noted, "personal care" includes "general supervision and oversight of the physical and mental well-being of an individual who is incapable of maintaining a private, independent residence or who is incapable of managing his person, whether or not a guardian has been appointed for such individual." 77 Ill. Adm. Code 300.330, amended at 30 Ill. Reg. 5213, 5243 (eff. Mar. 2, 2006). "Oversight" includes "general watchfulness and appropriate reaction to meet the total needs of the residents, exclusive of nursing or personal care." 77 Ill. Adm. Code 300.330, amended at 30 Ill. Reg. 5213, 5243 (eff. Mar. 2, 2006). Maplewood's violation of section 300.3240 was alleged to be a Type A violation, and the question is whether this violation "create[d] a condition or occurrence relating to the operation and maintenance of a facility presenting a substantial probability that death or serious mental or physical harm will result therefrom." 77 Ill. Adm. Code 300.274(b)(1), amended at 13 Ill. Reg. 4684, 4687 (eff. Mar. 24, 1989).

¶ 56    The administrative law judge found that "[t]he facility neglected R2 and R3 by failing to provide personal care and general supervision and oversight of their physical and mental well-being." Although the administrative law judge classified this finding as a "factual finding," this is a legal conclusion based on application of the facts of the case to the statute and regulations. Thus, we must review it as a mixed question of law and fact to determine whether the conclusion was clearly erroneous.

¶ 57    Maplewood argues:

"Failure to have a CHAR is not evidence of neglect, nor a *per se* violation of 300.3240(a). The Department failed to present any evidence that the facility did not provide adequate medical or general supervision. As a result, the ALJ's finding that the facility neglected the residents simply because the incident occurred is not supported by the evidence and must be reversed. Simply because the incident occurred does not mean that the facility was negligent. There is no strict liability in the applicable law.

The Department failed to call any witness to establish any act or omission by the facility that resulted in the incident, such as failure to provide adequate supervision *via* competent and ample staff. In fact, the uncontested evidence presented at [the] hearing indicated the opposite. All of the testimony and exhibits presented to the ALJ illustrated that the supervision provided was appropriate under the circumstances.

To this point, there was no indication for increased supervision of R3 beyond the supervision ordinarily provided at the facility, given that he had not been involved in any incident of physical aggression since his initial admission to the facility in April 2008."

¶ 58    However, leaving aside the violation of section 300.620(d)(3), the facts of this case establish a violation of section 300.1210(a). Despite not having the background check on R3 or the requisite CHAR, R3's caseworker, Vicki Hall, knew of R3's mental health issues, including his diagnosis of bipolar disorder with aggression, substance abuse problems, and general aggression. The staff at Maplewood also knew of R3's previous excursions from the facility when he returned apparently under the influence of either alcohol or illicit substances, including the occasion he fled and eluded the police, which led to his prior discharge from the facility. The failure to immediately incorporate increased supervision into R3's care plan upon his second admission, with or without obtaining the required background check, constitutes a failure to develop a comprehensive care plan to meet the mental and psychosocial needs of both R3 and R2. This is especially true when R3, a 21-year-old, 6-foot, 217-pound physically able-bodied and healthy young male, voiced strong sexual urges in a nursing home that is also occupied by less able-bodied older residents who are not able to protect themselves. R3 was able to bypass Maplewood workers in the middle of the night and go to a different floor and different wing of the facility unstopped.

¶ 59    Maplewood also argues specifically that there is no evidence from which the administrative law judge could have concluded a failure in oversight or supervision based on the fact that R3 passed nursing stations on his way to rape R2. The administrative law judge had made the factual finding that R3 "pass[ed] two nursing stations to enter R2's room and sexually assault her." This factual finding is reviewed under the manifest weight of the evidence standard, and we determine the manifest weight of the evidence supports this finding. Maplewood argues that there was no evidence that R3 passed any nursing stations on the night he raped R2. However, the Department's Exhibit 20 depicts the layout of Maplewood and clearly indicates a nursing station in the middle of the facility on each floor where all the wings intersect, showing that R3 must have passed the nursing stations that night. At the very least, because R2 was located on the opposite wing, R3 must have passed at least one nursing station. The fact that there is indeed a nursing station in the middle of

each floor at the intersection of all the wings was undisputed. The fact that R2 was on a different floor and in a different wing was also undisputed. Yet no one stopped his movement to another floor and another wing to enter an elderly resident's room to rape her in the middle of the night.

¶ 60    Even without the results from a proper background check and a CHAR, the failure to have increased supervision of a 21-year-old, 6-foot, 217-pound male with substance abuse problems, mental health issues and aggression who vocalized strong sexual urges in a nursing home with less able-bodied older residents without substantially increasing supervision of him constituted neglect that created a condition that presented a substantial probability that serious mental or physical harm will result.

¶ 61    R3's known problems also support the administrative law judge's conclusions that Maplewood neglected R3 as well as R2. In *Litchfield Terrace, Ltd. v. Department of Public Health*, 252 Ill. App. 3d 1090 (1993), *appeal denied*, 154 Ill. 2d 561 (1994) (table), this court held that there was sufficient evidence to support the conclusion that an intermediate care facility neglected a resident pursuant to section 300.3240(a) where the resident's mental health as well as the weather conditions warranted closer monitoring of a his activities where he was a chronic schizophrenic with a history of drug abuse and had absconded from the facility on previous occasions but was allowed to leave the facility alone for over two hours and was later found dead from heat stroke caused by exposure to high temperatures and humidity. *Litchfield Terrace, Ltd.*, 252 Ill. App. 3d at 1099.

¶ 62    Similarly here, R3's history of drug and alcohol abuse, mental health problems, including bipolar disorder with aggression, and his known history of leaving the facility and eluding the police, should have indicated a need for greater supervision not only for the safety of R2 but also R3's own safety. As the administrative law judge concluded, Maplewood neglected both R2 and R3. The administrative law judge's conclusion that Maplewood neglected R2 and R3 by failing to provide personal care and general supervision and oversight of their physical and mental well-being was not clearly erroneous.[2]

¶ 63    Lastly, Maplewood also argues that "[n]one of the Code sections cited by the Department support a strict liability standard, nor has the Department presented any law which would suggest that application of such a standard would be appropriate in this case." In support, Maplewood cites to decisions by federal courts of appeal. However, these authorities are inapposite, as they deal with federal regulations and the Code of Federal Regulations of the United States Department of Health and Human Services and not the regulations in the Code adopted pursuant to the Illinois Nursing Home Care Act. See *Crestview Parke Care Center v. Thompson*, 373 F.3d 743 (6th Cir. 2004) (reviewing an administrative finding by the

---

[2]We further note that, although the administrative law judge did not make a further finding that there was abuse under section 300.3240(a), R3's subsequent rape of R2 constituted abuse as defined in section 1-103 of the Nursing Home Care Act (210 ILCS 45/1-103 (West 2008)), which also presented a substantial probability of serious mental or physical harm to satisfy the standard for a Type A violation. However, the administrative law judge did not make this determination, and thus it is not before us.

Department of Health and Human Services that a long-term care facility violated federal regulations by committing numerous housekeeping violations, that residents were not being properly treated for pressure sores, and that there were food-related and training violations); *Woodstock Care Center v. Thompson*, 363 F.3d 583 (6th Cir. 2003) (reviewing a decision by the Departmental Appeals Board of the United States Department of Health and Human Services affirming the imposition of a civil monetary penalty by the Health Care Financing Administration pursuant to its finding that a long-term care facility was in violation of 18 administrative requirements that facilities prevent accidents or risk of accidents to residents); *Fal-Meridian, Inc. v. United States Department of Health & Human Services*, 604 F.3d 445 (7th Cir. 2010) (reviewing an order of the Departmental Appeals Board of the United States Department of Health and Human Services which imposed a civil penalty on petitioner for having violated a regulation under the Medicare and Medicaid provisions of the Social Security Act when a resident of a nursing home who suffered from schizophrenia and dysphagia died after consuming her roommate's food in violation of a strict *nil per os* (nothing by mouth) order). Further, none of these cases dealt with any federal provision regarding criminal background checks that can be likened to the Illinois regulations requiring background checks and fashioning appropriate care plans and supervision of identified offenders.

¶ 64    The fact that there is no defense exculpating nursing homes from liability for failing to properly perform a required background check and the ensuing failure to properly supervise such residents evinces the strong policy of protecting nursing home residents. "Indeed, the vital policy of protecting nursing home residents has been seen as justification for allowing the imposition of treble damages for even negligent acts or omissions." *Graves v. Rosewood Care Center, Inc.*, 2012 IL App (5th) 100033, ¶ 24 (citing *Harris v. Manor Healthcare Corp.*, 111 Ill. 2d 350, 367 (1986)). Maplewood has shown no error in the administrative law judge's application of the regulations to this case.

¶ 65                                    CONCLUSION

¶ 66    We conclude that the administrative law judge's determination that Maplewood committed the three violations of the Skilled Nursing and Intermediate Care Facilities Code as alleged by the Department was not clearly erroneous. First, Maplewood committed a Type B violation of section 300.620(d)(3) (77 Ill. Adm. Code 300.620(d)(3) (2007)) by admitting and keeping R3 as a resident when he was an identified offender without properly requesting a criminal background check. Second, Maplewood also committed a Type A violation of section 300.1210(a) (77 Ill. Adm. Code 300.1210(a), amended at 23 Ill. Reg. 8106 (eff. July 15, 1999)) by failing to provide necessary care and service to both R3 and R2. Finally, Maplewood committed a Type A violation of section 300.3240(a) (77 Ill. Adm. Code 300.3240(a), amended at 15 Ill. Reg. 554 (eff. Jan. 1, 1991)) by neglecting both R3 and R2 in failing to provide the proper supervision of R3.

¶ 67    Affirmed.